# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
Originally Filed: November 14, 2022
Refiled in Redacted Form: January 23, 2023

* * * * * * * * * * * * * *
| | | |
|---|---|---|
| STEPHANIE ROSCOE, as | * | PUBLISHED |
| Representative of the Estate of | * | |
| B.R., deceased, | * | |
| | * | |
| Petitioner, | * | No. 11-206V |
| | * | |
| v. | * | Special Master Nora Beth Dorsey |
| | * | |
| SECRETARY OF HEALTH | * | Decision on Damages; Set-Off; |
| AND HUMAN SERVICES, | * | Insurance Policy; Vaccine Act § 15(a); |
| | * | Vaccine Act § 15(g); Pain and Suffering; |
| Respondent. | * | Death Benefit. |
| | * | |

* * * * * * * * * * * * * *

Richard Gage, Richard Gage, P.C., Cheyenne, WY, for Petitioner.
Kyle Edward Pozza, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION ON DAMAGES[1]

### I. INTRODUCTION

On April 4, 2011, Stephanie Roscoe ("Petitioner"), as representative of the estate of B.R., deceased, filed a petition under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2012).[2]  Petitioner alleged that as a result

---

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).  **This means the Decision will be available to anyone with access to the Internet.**  In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2012).  All citations in this Decision to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

of B.R. receiving hepatitis A, tetanus-diphtheria-acellular pertussis ("Tdap"), meningococcal conjugate ("Menactra"), and human papillomavirus ("HPV") vaccines on March 31, 2009, B.R. suffered fever, leg and bodily pain, emotional and mental confusion and anguish, and death. Petition at 1 (ECF No. 1). An entitlement hearing was held on January 8, 2020, after which the undersigned found Petitioner entitled to compensation on June 8, 2020. Ruling on Entitlement dated June 8, 2020 (ECF No. 183).

During the pendency of her vaccine petition in this Court, Petitioner executed a "Settlement Agreement and Limited Release of Claims" (hereinafter the "Settlement Agreement") with certain defendants, arising out of a civil action for alleged negligence resulting in the personal injury and death of B.R.[3] Respondent's Exhibit ("Resp. Ex.") DD at 1. On May 9, 2022, the undersigned ruled that Petitioner's vaccine award was subject to a set-off pursuant to § 15(g) of the Vaccine Act, to the extent that any of the settlement proceeds were paid "under an insurance policy." Ruling on Set-Off dated June 27, 2022 (ECF No. 245).

This Decision resolves the appropriate award of compensation to Petitioner under the Vaccine Act and addresses the question of whether the award is subject to a set-off. After reviewing the evidence in accordance with the applicable statutes, standards, and law, the undersigned finds that Petitioner is entitled to compensation in the amount of $500,000.00, consisting of an award of $250,000.00 for pain and suffering and $250,000.00 for the death

---

[3] For an explanation of the procedural history, see Ruling on Entitlement at 3. Briefly, Petitioner filed a Complaint in a State Court in April 2011 against several individually named physicians, their employers, and the hospital. See Response to Court Order, filed July 18, 2014, at 2-20 (ECF No. 49). Petitioner also filed an amended complaint, which alleged negligent acts committed by the physicians and nursing staff of the hospital. Id. at 21-36. The individual defendants were subsequently dismissed. Neither the complaint nor the amended complaint stated any vaccine-related allegations against the person who administered the vaccines, or the manufactures of the vaccines.

On July 21, 2014, the special master presiding over the case issued an Order to Show Cause why the case should not be dismissed because Petitioner had a pending civil action when she filed her petition in this Court. Order dated Sept. 25, 2014, at 3 (ECF No. 54). The issue was briefed, and the parties agreed that the controlling case was Schumacher v. Secretary of Health & Human Services, 2 F.3d 1128 (Fed. Cir. 1993). Id. (citing Petitioner's ("Pet.") Brief in Support of Mutual Agreed upon Stipulation Approval and Opposition to Dismissal, filed Aug. 22, 2014, at 3-4 (ECF No. 52); Resp. Reply to Pet. Response to the Order to Show Cause and Motion to Strike, filed Sept. 25, 2014, at 4 (ECF No. 53)). In Schumacher, the Federal Circuit held that the Vaccine Act does not bar a petitioner from filing a vaccine petition when her pending civil action is not against a vaccine manufacturer or vaccine administrator. Id.; Schumacher, 2 F.3d at 1133. Thus, the special master issued an order in which she ruled that the Vaccine Act did not require dismissal of the petition in this Court. Order dated Sept. 25, 2014, at 3.

benefit.[4]  This award is not subject to a set-off because there is not preponderant evidence that the settlement proceeds were paid "under an insurance policy."

## II.     PROCEDURAL HISTORY

Petitioner filed her petition on April 4, 2011, alleging that as a result of B.R. receiving hepatitis A, Tdap, Menactra, and HPV vaccines on March 31, 2009, B.R. suffered fever, leg and bodily pain, emotional and mental confusion and anguish, and death.  Petition at 1.  The procedural history from April 2011 through March 2020 was set forth in the undersigned's Ruling on Entitlement and will not be repeated here.  See Ruling on Entitlement at 2-5.

Subsequently, in a status conference held on December 3, 2020, the undersigned determined that the facts and law presented here required production of Petitioner's settlement agreement from her state civil action.  Order dated Dec. 3, 2020 (ECF No. 197).  Given the confidential nature of the settlement agreement, Respondent was directed to subpoena Petitioner's attorney in the civil action and file the settlement agreement.  Id. at 2-3.

On March 8, 2021, Respondent filed a redacted version of the Settlement Agreement from Petitioner's civil action.  Resp. Ex. CC.  Specifically, the amounts paid under the agreement were redacted.  See id.  Thereafter, the parties filed a joint status report indicating that they disagreed about whether the redacted information was relevant.  Joint Status Rept., filed Apr. 7, 2021 (ECF No. 204).  After both parties were afforded the opportunity to state their positions, the undersigned found the redacted information was relevant for purposes of determining the amount of damages in this matter.  Order dated May 4, 2021, at 1-2 (ECF No. 205).  Further, the parties disagreed about whether a set-off was appropriate.  Id.  The parties agreed to brief the issue of set-off once the non-redacted settlement agreement was filed.  Id. at 2.

Respondent filed the non-redacted Settlement Agreement on December 22, 2021.  Resp. Ex. DD.  The parties filed their briefs, and on May 9, 2022, the Ruling on Set-Off issued, finding Petitioner's vaccine award was subject to a set-off pursuant to § 15(g) of the Vaccine Act to the extent that any of the settlement proceeds were paid "under an insurance policy."  Ruling on Set-Off.  The undersigned noted that from her review of the Settlement Agreement, it was not clear what money was paid under an insurance policy or policies.  Order dated May 10, 2022, at 1 (ECF No. 235).  Respondent was directed to subpoena this information from those most knowledgeable.  Id.

Thereafter, Respondent and Petitioner filed status reports regarding their positions on the death benefit and pain and suffering award.  Resp. Status Rept., filed July 8, 2022 (ECF No. 247) ("Resp. Damages Status Rept."); Joint Status Rept., filed Aug. 10, 2022 (ECF No. 249) ("Joint Damages Status Rept."); Petitioner's Status Rept., filed Aug. 10, 2022 (ECF No. 250) ("Pet. Damages Status Rept.").  On August 26, 2022, Respondent filed the subpoena responses

---

[4] The parties agree that Petitioner is entitled to the death benefit under the Vaccine Act, but disagree as to the appropriate award for pain and suffering.  Joint Status Report ("Rept."), filed Aug. 10, 2022 (ECF No. 249) ("Joint Damages Status Rept.").

3

containing discovery information related to payment under the Settlement Agreement. Resp. Ex. EE-FF. Then both parties filed a memorandum on damages and set-off. Resp. Memorandum on Damages and Offset of Prior Civil Settlement for Vaccine Injury ("Resp. Memo."), filed Sept. 26, 2022 (ECF No. 253); Pet. Memorandum on Damages and Offsets ("Pet. Memo."), filed Sept. 26, 2022 (ECF No. 254).

This matter is now ripe for adjudication.

## III.   ISSUES TO BE DECIDED

There are two issues in dispute. First, the parties disagree on the appropriate amount of pain and suffering damages. Joint Damages Status Rept. at 1. They agree that Petitioner is entitled to the Death Benefit Award. Id. There are no other items of damages sought by Petitioner. See Joint Status Rept., filed July 8, 2020 (ECF No. 186) (noting Petitioner is not making a claim for unreimbursed expenses or loss of earnings).

Secondly, the parties dispute whether Petitioner's Vaccine Act award should be offset by the settlement proceeds from the underlying civil action. Pet. Memo.; Resp. Memo.

## IV.   BACKGROUND

### A.   Brief Factual Summary[5]

On March 31, 2009, B.R. presented to her pediatrician's office for her 11-year well-child visit. Pet. Ex. 14 at 3. B.R. received the Hep A and HPV vaccines in her upper right arm and the Tdap and Menactra vaccines in her upper left arm. Id. at 4.

On the following day, April 1, 2009, at 5:45 PM, B.R. was admitted to the Emergency Department ("ED") with complaints of hip pain and fever. Pet. Ex. 14 at 10. She was noted to have been febrile with poor oral intake. Id. B.R.'s pain began at 3:30 AM and was described as "affecting [her] left iliac crest and pelvis." Id. at 11. B.R. had no history of cough, sore throat, runny nose, or ear pain. Id. Prior to her arrival, she had "been playful and normally active." Id. She did have history of fever for the last few hours, with a maximum temperature of 102 to 103, without chills or sweats. Id. She had no nausea, vomiting, or diarrhea. Id.

B.R. was discharged from the ED at 8:47 PM. Pet. Ex. 14 at 14. Her temperature at the time of discharge remained abnormal and her mother was advised to follow-up with her pediatrician if B.R.'s symptoms worsened. Id. B.R.'s pain at the time of discharge was 2/10. Id.

A "Pediatric Admission Date Base" form was completed[6] and documented that B.R. had achieved all her developmental milestones. Pet. Ex. 14 at 7. She was independent with self-care

---

[5] For a more complete factual summary, see Ruling on Entitlement at 5-14.

[6] This form bears two dates, April 1, 2009 and April 3, 2009. Regardless of the date this form was completed, it reflects B.R.'s pre-illness condition.

4

and completed all activities of daily living.  Id.  She was also able to "[p]articipate[] in Health Care decisions."  Id.

At 8:04 AM on April 3, 2009, B.R. was taken by her parents to the ED for fever and pain in the left thigh, with nausea and vomiting, and a rash.  Pet. Ex. 14 at 120.  A "Patient Sign-in Sheet Patient Information" form was completed and stated that B.R. had a "[h]igh fever since Tues[day].  Extreme upper thigh pain.  She had 4 vaccines on Tues[day].  Gagging Dehydrated."  Id. at 133.  On the form's list of signs and symptoms, B.R. was noted to have fever and fatigue.  Id.  She did not have a cough, shortness of breath, or close contact with a person who had respiratory symptoms.  Id.

B.R. was transported to another hospital by ambulance on April 3, 2009.  Pet. Ex. 14 at 35.  The ambulance trip report stated B.R. was being transferred for follow-up care "for a possible allergic reaction to immunizations administered on 03/31/2009."  Id.  She complained of left hip pain, described "as sharp and non-radiating" and she rated her "pain as 10 on 1-10 scale."  Id.

At 11:10 PM, April 3, 2009, the nursing staff learned that the blood cultures drawn earlier were positive, showing gram positive cocci in chains.  Pet. Ex. 14 at 57, 71.  An antibiotic, ceftriaxone, was ordered.  Id.

Throughout the early hours of April 4, 2009, B.R. received medication for hip pain.  See Pet. Ex. 14 at 71.  At 1:25 AM, she was given morphine, at 5:10 AM, she was given Toradol, and at 6:45 AM, she was again given morphine.  Id.  At 6:45 AM, her left hip was described as swollen, with bruising, and the skin was taut.  Id.  At 9:30 AM, B.R. was found unresponsive but breathing.  Id. at 61-62.  Dr. [. . .] arrived and a code was called.  Id. at 62.  B.R. was taken to the ED for emergent care because the ICU was full.  Id. at 62, 81.  B.R. progressively worsened and despite lengthy resuscitative efforts, she died at 12:27 PM on April 4, 2009.  Id. at 70, 81, 112-13.

On April 21, 2009, the death certificate identified necrotizing fasciitis[7] (Group A *Streptococcus*) as the cause of death.  Pet. Ex. 12.

### B.      Relevant Portions of the Civil Action Complaint and Settlement Agreement

Petitioner's State Court civil action was brought by Stephanie Roscoe and [. . .] (Plaintiffs) as the parents of and administrators of the estate of their deceased daughter, B.R.  Response to Court Order ("Complaint"), filed July 18, 2014, at 3 (ECF No. 49).  They sued seven defendants, alleging medical negligence and wrongful death of B.R.  Id.  In the Complaint, the ad damnum clause requested "[t]hat they recover on behalf of [B.R.'s] estate for her injuries and damages"

---

[7] Necrotizing fasciitis is "a fulminating subcutaneous soft tissue infection beginning with extensive cellulitis that rapidly spreads to involve the superficial and often the deep fascia, producing thrombosis of subcutaneous vessels and gangrene of the underlying tissues." Necrotizing Fasciitis, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/ dorland/definition?id=75008 (last visited Nov. 4, 2022).

and "[t]hat they recover the full value of [B.R.'s] life under the wrongful death statute." Id. at 3, 17.

The plaintiffs and certain defendants in the civil action entered into a Settlement Agreement. Under the terms of the Settlement Agreement, Ms. Roscoe and Mr. [. . .], as the parents of and administrators of the estate of their deceased daughter, B.R., were identified as the "Releasors." Resp. Ex. DD at 1. The "Releasees" were certain defendants in the civil action. Id.

The "recitals" in the Settlement Agreement stated that the "Complaint arose out of certain alleged negligent acts or omissions by Releasees and the other named Defendants (hereinafter "the Incident"), and which [Releasors] allege caused the death of [B.R.]." Resp. Ex. DD at 1.

Additionally, the Releasors agreed to

> completely release and forever discharge Releasees, from any and all past, present[,] and future claims, demands, obligations, actions, causes of action, suits at law or equity, rights, damages, costs, losses, loss of services, or expenses and compensation of any nature whatsoever, whether based on a tort, contract[,] or other theory of recovery, which Releasors now have, or which may hereafter accrue or otherwise be acquired, on account of, or may in any way grow out of, or which are the subject of the Complaint including, without limitation, any and all known or unknown, claims, injuries to person, property and/or reputation, wrongful death, pain and suffering, mental and/or emotional anguish, punitive damages, medical, hospital, and/or other expenses of any kind whatsoever, loss of wages, loss of income and/or compensation, loss of consortium or services of whatsoever kind in nature, and/or other claims for monetary relief against Releasees.

Resp. Ex. DD at 2-3.

Two entities, [. . .] Insurance Company ("Insurance Company") and [. . .] Indemnity, LLC ("Indemnity, LLC") were identified in the Settlement Agreement as "the primary liability insurers of the Releasees." Resp. Ex. DD at 1. The Settlement Agreement did not identify any insurance policy or policies that would pay out the proceeds.

The settlement proceeds included a lump sum payment as well as structured settlements to fund annuities or a "stream of future periodic payments" for both Ms. Roscoe and Mr. [. . .].[8] Resp. Ex. DD at 7.

The "Releasors" represented that one or both of them were "duly appointed administrator(s) of the estate of [B.R.]." Resp. Ex. DD at 8. Petitioner, Stephanie Michelle Roscoe, signed the Settlement Agreement "Individually, and as Parent and Natural Guardian of [B.R.], deceased, and as the Administrator of the Estate of [B.R.], deceased." Id. at 11.

---

[8] Respondent does not argue that the money paid for these annuities is subject to the set-off. See Resp. Brief on Damages and Offset ("Resp. Br."), filed Mar. 16, 2022, at 4-8 (ECF No. 232).

6

### C. Discovery After Ruling on Set-Off

After the Ruling on Set-Off issued, there was a period of discovery during which Respondent served subpoenas on Insurance Company and Indemnity, LLC, and the attorney who represented B.R.'s parents in the state civil action. Order dated June 24, 2022 (ECF No. 242); Order dated June 24, 2022 (ECF No. 243); Order dated June 24, 2022 (ECF No. 244).

Indemnity, LLC did not respond to the subpoena. Resp. Memo. at 3.

In response to the subpoena issued to Insurance Company, the Associate General Counsel authored a letter confirming that Insurance Company "did not make any payments in connection with the settlement of the civil action." Resp. Ex. EE at 2.

The attorney who represented B.R.'s parents in the civil action produced several documents, including a copy of the Closing Statements, setting forth the total settlement amount, attorneys' fees, litigation costs, and the total funds paid to Ms. Roscoe and Mr. [. . .]. Resp. Ex. FF at 8, 11.

The documents produced by the attorney also included a copy of a check which reflected the lump sum payment of the settlement proceeds. Resp. Ex. FF at 14. The payor was Indemnity, LLC. Id. The check was made payable to "Stephanie Michelle Roscoe and [. . .], as parents and natural guardians of [B.R.], and as Administrator of the Estate of [B.R.] (Stephanie Michelle Roscoe) and [], their attorney." Id.

Additional documents filed by Respondent are products of research conducted by their counsel. The first of these is from an online search of the South Carolina Secretary of State business entities for Indemnity, LLC. Resp. Ex. GG. This document shows that Indemnity, LLC was incorporated in 2006 and "[m]erge[d] [o]ut of [e]xistence into a non-registered Foreign Entity" in January 2019. Id. at 1.

Respondent's counsel also filed financial statements of [. . .] Indemnity, Ltd., showing that it merged with Indemnity, LLC in January 2019. Resp. Ex. HH at 9. Once the merger occurred, [. . .] Indemnity, Ltd. was the only surviving entity. Id. The financial statements were prepared by KPMG as a result of an audit it performed for the period of November 2018 to July 2019. Id. at 3. The statements provide the financial position of [. . .] Indemnity, Ltd. as of July 31, 2019. Id. Indemnity, LLC was not audited. And no financial records of Indemnity, LLC were filed.

KPMG provided background information in the financial statements, stating that Indemnity, LLC was organized in 2006 "as a single parent captive . . . to insure the risks of the Parent."[9] Resp. Ex. HH at 9. [. . .] Indemnity, Ltd. "continued the business of [Indemnity, LLC] to provide insurance coverage to the Parent." Id. While a detailed explanation of how the new entity provided insurance coverage to the Parent, there was no information about how the prior

---

[9] The Parent is identified as "[. . .] Health System." Resp. Ex. HH at 9.

7

entity, Indemnity, LLC, provided insurance coverage to the Parent from 2006 until it was dissolved in 2019.  See Resp. Ex. HH.

## V.    PARTIES' CONTENTIONS

### A.    Petitioner's Contentions

#### 1.    Pain and Suffering Award

Petitioner argues that "the Estate of B.R. should [] be awarded the statutorily capped amount of $250,000 for [p]ain and [s]uffering and [e]motional [d]istress."  Pet. Damages Status Rept. at 1.

In support of the amount sought, Petitioner states that B.R., age 11, was fully aware and suffered severe pain that required the use of morphine and fentanyl at the time of her injury and death.  Pet. Damages Status Rept. at 1.  Her records document that her pain was a 10 out of 10 on the pain scale.  Id.  Petitioner further notes that B.R.'s diagnosis was caused by necrotizing fasciitis, a "flesh eating bacteria" that resulted in "a terrible and painful death."  Id. at 2.

#### 2.    Set-Off

Petitioner argues that the proceeds of the Settlement Agreement were not disbursed to the Estate of B.R., stating "the Estate never received any money from the settlement."  Pet. Memo. at 2.  Petitioner also argues that the Estate attorney "opined that the settlement award was exclusively for the wrongful death claims of the parents," not the Estate.  Id.  Therefore, Petitioner concludes that "[t]here is [] no money from the [] civil action available for offset against the Estate."  Id. at 4.

Further, Petitioner asserts that Respondent has failed to provide preponderant evidence that any of the settlement funds are legally attributable to the Estate.  Pet. Memo. at 6.  Based upon information set forth in the Closing Statement describing disbursement of the settlement proceeds, Petitioner notes that Respondent failed to deduct attorney's fees and costs from the amount Respondent contends should be offset.  Id. (citing Resp. Ex. FF at 8, 11).  Petitioner also asserts that the money paid to the parents reflected damages for the wrongful death of their child, and that the Estate has no legal interest in these damages.  Id. at 7.

In summary, Petitioner concludes that "[t]he settlement agreement did not attribute any specific amount to the Estate," and that "[n]o money was distributed to the Estate."  Pet. Memo. at 7.  Therefore, she argues that "there is no money available to be offset against an award in this Program."  Id.

### B.    Respondent's Contentions

#### 1.    Pain and Suffering

Respondent does not agree that the $250,000 cap for pain and suffering is warranted.

8

Resp. Damages Status Rept. at 1. Based on similar cases and the overall duration of B.R.'s illness, Respondent believes that an appropriate award falls in the range between $160,000.00 and $225,000.00. Id. at 1-2.

### 2. Set-Off

Respondent acknowledges that the undersigned previously ruled that § 15(g) of the Vaccine Act provides that any payments made under "an insurance policy" are subject to a set-off. Resp. Memo. at 3. Respondent argues that a set-off is appropriate. Id. at 1.

Respondent summarizes the documents filed pursuant to the subpoenas. Respondent states that "documents from [] Insurance Company indicate that it 'did not make any payments in connection with the settlement of the civil action.'" Resp. Memo. at 3 (quoting Rep. Ex. EE at 2).

Next, Respondent asserts that the documents produced by the attorney who represented the parents in the civil action include a check which shows that Indemnity, LLC paid $[. . .] to " Stephanie Michelle Roscoe and [. . .], as parents and natural guardians of [B.R.], and as Administrator of the Estate of [B.R.] (Stephanie Michelle Roscoe) and [], their attorney," which is consistent with the Settlement Agreement. Resp. Memo. at 3 (quoting Resp. Ex. FF at 14); see also Resp. Ex. DD at 6-7. Additionally, Respondent states that B.R.'s parents were paid money in their individual capacities, which was used to purchase structured settlement annuities. Resp. Memo. at 3-4. Respondent concludes that "there can be no dispute that [Indemnity, LLC] paid [P]etitioners $[. . .], as parents and natural guardians and administrators of the estate of B.R." Id. at 4.

Indemnity, LLC did not respond to the subpoena.[10] Pet. Memo. at 4. Counsel for Respondent conducted research showing the entity dissolved in 2019. Id. Based on financial statements obtained on the internet, Respondent argues that Indemnity, LLC "issued[] policies of insurance including liability insurance." Id.

Respondent asserts that "[a]lthough the specific policy of insurance has not been produced despite a subpoena, it is clear that [Indemnity, LLC] was organized on August 1, 2006 as a single parent captive under the insurance laws of the state of South Carolina to insure the risks of [the Parent]," and that "[i]t d[id] so by issuing 'a claims-made policy covering professional and general liabilities.'" Resp. Memo. at 5 (quoting Resp. Ex. HH at 9). Thus, Respondent concludes that "[Indemnity, LLC] paid $[. . .] in the civil action pursuant to a policy of insurance for the same items of compensation that are compensable in the Vaccine Act" and that this payment is "a complete offset to pain and suffering, the death benefit, and any claimed out of pocket expenses in this matter."[11] Id. at 5-6.

---

[10] Respondent did not describe any steps taken to enforce the subpoena. Additional discovery was not requested by Respondent as to Indemnity, LLC or any other related company, including Indemnity, Ltd., the company that merged with Indemnity, LLC.

[11] Petitioner is not making a claim for unreimbursed expenses (out-of-pocket expenses) or loss of earnings. Joint Status Rept., filed July 8, 2020.

## VI. VACCINE ACT AND LEGAL STANDARDS

### A. Vaccine Act Damages and Secondary Payor Provisions

Pursuant to § 15(a) of the Vaccine Act, a petitioner entitled to an award of compensation may recover past and future unreimbursed expenses, "an award of $250,000 for the estate of the deceased" in "a vaccine-related death," actual and anticipated loss of earnings, and "actual and projected pain and suffering and emotional distress . . . not to exceed $250,000." § 15(a).

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4). Petitioner bears the burden of proof with respect to each element of compensation requested. Brewer v. Sec'y of Health & Hum. Servs., No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. I.D. v. Sec'y of Health & Hum. Servs., No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); Stansfield v. Sec'y of Health & Hum. Servs., No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: (i) awareness of the injury; (ii) severity of the injury; and (iii) duration of the suffering. I.D., 2013 WL 2448125, at *9 (quoting McAllister v. Sec'y of Health & Hum. Servs., No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated & remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995)).

The undersigned may look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in this case. See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs., 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). The undersigned may also rely on her experience adjudicating similar claims. Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. See Graves v. Sec'y of Health & Hum. Servs., 109 Fed. Cl. 579 (2013).

In Graves, Judge Merow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. Judge Merow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." Graves, 109 Fed. Cl. at 589-90. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering

awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program.  Id. at 595.

"Compensation awarded under the Program may not include . . . compensation for other than the health, education, or welfare of the person who suffered the vaccine-related injury with respect to which the compensation is paid."  § 15(d)(2).  Payment of these elements of compensation is limited by § 15(g) of the Vaccine Act, which provides that

> Payment of compensation under the Program shall not be made for any item or service to the extent that payment has been made, or can reasonably be expected to be made, with respect to such item or service (1) under any State compensation program, under an insurance policy, or under any Federal or State health benefits program . . . , or (2) by an entity which provides health services on a prepaid basis.

§ 15(g).  Thus, compensation awarded pursuant to § 15(a) is subject to the constraints of § 15(g), which establishes that the Program is a secondary payer for the enumerated sources of funds, except for Medicaid.  See id.

"Looking to the language of § 15(g), Congress specifically enumerated the types of funding sources that would offset compensation awards."  Heinzelman v. Sec'y of Health & Hum. Servs., 681 F.3d 1374, 1382 (Fed. Cir. 2012).

It is a well-settled principle of statutory interpretation that "[w]hen . . . the terms of a statute [are] unambiguous, judicial inquiry is complete, except in rare and exceptional circumstances."  Glaxo Operations UK Ltd. v. Quigg, 894 F.2d 392, 395 (Fed. Cir. 1990); see also Hellebrand v. Sec'y of Health & Hum. Servs., 999 F.2d 1565, 1569 (Fed. Cir. 1993) (quoting Brookside Veneers, Ltd. v. United States, 847 F.2d 786, 788 (Fed. Cir. 1988) ("It is a general rule of statutory construction that where Congress has clearly stated its intent in the language of a statute, a court should not inquire further."), cert. denied, 488 U.S. 943).  A judicial officer should not add words to a statute, but should instead "interpret [] the statute as it was enacted."  Beck v. Sec'y of Health & Hum. Servs., 924 F.2d 1029, 1034 (Fed. Cir. 1991).

## VII. ANALYSIS

The undersigned awards Petitioner $250,000.00 for the pain and suffering of her daughter, B.R.  The undersigned also awards Petitioner $250,000.00 for B.R.'s vaccine-related death.[12]  Further, the undersigned finds that Petitioner's award of pain and suffering and the death benefit are not subject to a set-off because there is no evidence that any payment of the underlying civil action settlement was made "under an insurance policy."  § 15(g).

---

[12] Petitioner is not making a claim for unreimbursed expenses (out-of-pocket expenses) or loss of earnings.  Joint Status Rept., filed July 8, 2020.

### A. Death Benefit

The parties agree the Petitioner is entitled to the death benefit award of $250,000.00 for B.R.'s vaccine-related death. Joint Damages Status Rept. at 1. Thus, the undersigned awards Petitioner, as the administrator of the estate of B.R., $250,000.00 under § 15(a)(2) for the vaccine-related death of B.R.

### B. Pain and Suffering

When performing this analysis, the undersigned reviewed the record as a whole, including the medical records, affidavits, testimony, and expert opinions. The undersigned bases her Decision as to the appropriate amount of damages on the particular facts and circumstances of this specific case.

As described above, there are three factors to consider when determining an appropriate award for pain and suffering. These include awareness of the injury, severity of the injury, and duration of the suffering. As for awareness of her injury, B.R. was 11 years old at the time of her vaccination. Although she was young, a developmental assessment established that B.R. met all her developmental milestones. The medical records show that she was fully alert and aware of her condition, able to describe her pain, and able to rate her pain level. Thus, the undersigned finds that she was fully aware of her condition.

Regarding severity, the medical records establish that B.R. had fever and mild hip pain rated a level two out of 10 on the pain scale on April 1, 2009. By April 3, she was severely ill with fever, fatigue, and extreme upper thigh pain, described as 10 out of 10 on the pain scale. Throughout the early hours of April 4, she received several doses of morphine, as well as Toradol, for her severe pain. Her left hip was described as swollen, with bruising, and her skin was taut. She became unresponsive, and despite lengthy resuscitative efforts, she succumbed to her injuries. Cause of death was necrotizing fasciitis due to Group A *Streptococcus*.

There is no question that B.R. suffered extreme and agonizing pain and suffering. While the duration of her pain was limited, the severity of it was incomprehensible, especially in the last day of her life when pain medication offered no relief. Given the injury suffered, and the description of B.R.'s condition set forth in the medical records and autopsy reports, the undersigned finds that $250,000.00 is a reasonable and appropriate award for pain and suffering.

### C. Set-Off

"The plain language of the Vaccine Act reflects that the Program is a secondary payer to any insurance policy. It does not limit offsets to health insurance policies." Helman, 2014 WL 3589564, at *2. Therefore, the question presented is whether payment from the Settlement Agreement in Petitioner's civil action was paid "under an insurance policy."

The Settlement Agreement was executed October 25, 2013, between Stephanie Roscoe and [. . .], as the parents of and administrators of the estate of their deceased daughter, B.R. (Releasors), and [. . .] Hospital Inc., [. . .], and [. . .] (Releasees). Resp. Ex. DD at 1. The

Settlement Agreement identified the "Insurers" to the agreement as Indemnity, LLC and Insurance Company. Id. These two entities were identified as a "primary liability insurers of [the] Releasees." Id.

The newly filed evidence establishes that Insurance Company did not make any payments toward the settlement. Resp. Ex. EE at 2. Indemnity, LLC paid both the lump sum of $[. . .] as well as the amount to purchase the annuities for Stephanie Roscoe and [. . .], at a cost of $[. . .],[13] for a total settlement of $[. . .]. Resp. Ex. FF at 14-26. Both the settlement check and the annuity documents identify the payor/purchaser as Indemnity, LLC. Id.

The documents obtained via an internet search by Respondent's counsel show that Indemnity, LLC was organized in 2006, as a "single parent captive[14] under the captive insurance laws . . . to insure the risks of its Parent." Resp. Ex. HH at 9. But no evidence has been filed to establish how Indemnity, LLC insured those risks in 2013 when it paid the settlement proceeds at issue. Indemnity, LLC may have underwritten a policy of insurance that paid some or all of the settlement proceeds, but without proof that an "insurance policy" existed and without an "insurance policy" in evidence, it would be speculative to make any such assumption.

Moreover, the settlement proceeds were paid by "Indemnity, LLC." Section 15(g) of the Vaccine Act states that "[p]ayment of compensation under the Program shall not be made for any item or service to the extent that payment has been made . . . with respect to such item or service . . . under an insurance policy." No evidence has been filed to show Indemnity, LLC made the payment at issue "under an insurance policy." While the purpose of Indemnity, LLC may have been to "insure the risks of its Parent," this alone is not evidence that the payment at issue was made "under an insurance policy."

If Congress had wanted the Vaccine Program to be a secondary payer as to payments made by indemnity companies, it could have included such language in the statute. But it did not. The language of § 15(g) specifically enumerates the types of funding sources that may offset compensation awards. These include payments made "(1) under any State compensation program, under an insurance policy, or under any Federal or State health benefits program . . . , or (2) by an entity which provides health services on a prepaid basis." Payment "by an indemnity company" is not included. Payments by any source not expressly identified in the statute may not be used to offset awards of compensation. The statute provides that any sources not expressly identified may not be used to offset awards. Thus, it appears that Congress intended the secondary payor provision to be very narrowly construed.

Finally, the terms of this provision of the statute are unambiguous, and therefore, the

---

[13] Respondent argues only the lump sum of $[. . .] should be offset. Resp. Memo. at 3-6. Respondent does not argue that the annuities of $[. . .] should be offset. Id.

[14] "[A] captive is a wholly owned subsidiary created to provide insurance to its non-insurance parent company (or companies)." Captive Insurance Companies, NAIC, https://content.naic.org/cipr-topics/captive-insurance-companies (last updated Feb. 28, 2021).

undersigned may not add words to the statute or interpret the words to expand the reach of a statute.  <u>Glaxo Operations</u>, 894 F.2d at 395; <u>Beck</u>, 924 F.2d at 1034.

For these reasons, the undersigned finds there is not preponderant evidence that the settlement proceeds at issue were paid "under an insurance policy," and thus, the Petitioner's award of compensation is not subject to a set-off pursuant to §15(g) of the Vaccine Act.[15]

## VIII.   CONCLUSION

For the reasons discussed above, the undersigned awards the following compensation:

**A lump sum payment for $500,000.00, representing $250,000.00 for the death benefit and $250,000.00 for pain and suffering, in the form of a check payable to Petitioner.**

The Clerk of Court is directed to enter judgment in accordance with this Decision.[16]

**IT IS SO ORDERED.**

<u>s/Nora Beth Dorsey</u>
Nora Beth Dorsey
Special Master

---

[15] This finding renders moot the other issues raised by the parties, and especially the reasons articulated by the Petitioner as to why a set-off is not appropriate given the facts and circumstances here.

[16] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.  **In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.**